507 So.2d 111 (1986)
David Ray DUREN
v.
STATE.
6 Div. 619.
Court of Criminal Appeals of Alabama.
February 25, 1986.
On Return to Remand October 14, 1986.
Rehearing Denied November 12, 1986.
*112 Roger C. Appell, Birmingham, for appellant.
Charles A. Graddick, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
BOWEN, Presiding Judge.
David Ray Duren was convicted for the capital offense involving the robbery and intentional murder of Kathleen Bedsole in violation of Alabama Code 1975, § 13A-5-40(a)(2), and sentenced to death. Three issues are raised on this appeal of that conviction and sentence.

I
At the jury sentencing-phase of the defendant's trial, the trial judge instructed the jury that, "The only [aggravating] circumstances that I'm going to charge you on are what you heard at the trial as to the component portions of the offense itself and as to kidnapping. * * * Aggravating circumstances shall be the following: The capital offense was committed while the defendant was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit robbery or kidnapping." These were the only aggravating circumstances on which the jury was instructed. The defendant argues that these instructions violated his right to due process of law because the jury was never given a legal definition of kidnapping.
The aggravating circumstance upon which the jury was instructed is found in § 13A-5-49(4): "The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping." Alabama Code 1975, § 13A-5-49(4). The undisputed evidence in this case, including the facts admitted by the defendant, show that the capital offense was committed while the defendant was engaged in the commission of a robbery and a kidnapping.
This case is unique in that the defendant admitted that the State's evidence was undisputed except on the issue of whether or not the defendant intended to shoot Miss Bedsole. In his opening remarks, defense counsel stated, "Basically, the evidence is going to be, if not identical to what Mr. McDonald [Assistant District Attorney] said, it's going to be substantially the same. We expect the evidence will not sway very much from what Mr. McDonald said it was going to be [in his opening comments to the jury]." Defense counsel then argued that the defendant should be *113 convicted and punished for murder but not for capital murder.
In his closing argument, defense counsel stated, "The evidence is exactly undisputed. It comes out exactly the way Mr. McDonald said, but there is one point of dispute." That "point of dispute" was whether or not Miss Bedsole was facing the defendant at the time he shot her. Counsel stated, "And in fact everything that he [Leonard, the State's only eyewitness] said is exactly the way David [defendant] said it happened. There is no dispute. There is no difference except for that one point."
In complying with Alabama Code 1975, § 13A-5-47(d), the trial court entered written findings of fact summarizing the crime and the defendant's participation in it. On appeal, the defendant adopts those findings as his own and states, "There was never any dispute as to the facts of this case." Appellant's brief, p. 3. Those findings are:
"Findings of Fact from the Trial. This Court makes the following findings of fact from the trial based on the transcript of the testimony provided to this Court for review prior to the sentencing hearing:
"The victim in this case, Kathleen Bedsole, and her companion, Charles Leonard, were on a date on October 20th, 1983 and had left the victim's home at approximately 9:00 p.m. with the intention of going to visit some haunted houses sponsored by radio stations in the Birmingham area, as this was in the Halloween season.
"Sometime after leaving the victim's home, the couple had parked at a location in the Huffman area and, according to testimony of witness Charles Leonard, had been there some five to ten minutes prior to two individuals coming up to the car. One of the individuals was armed with a pistol and was identified by witness Leonard as being the defendant, David Ray Duren. The two individuals instructed the victim and her companion, Charles Leonard, to get out of the car and, further, that, if they did as they were instructed, they would be okay.
"The victim, Kathleen Bedsole, and her companion, Charles Leonard, were subsequently placed in the trunk of the automobile, and the car drove from that location. The witness Leonard testified that on being placed in the trunk that the car traveled for a short distance and stopped. He heard one of the car doors open and, after a short time span, close, and the car proceeded on. After traveling a short distance, the car appeared to get on an interstate highway and traveled for some length of time. On exiting the interstate, the car shortly thereafter entered what appeared to be a drive-in restaurant, and a conversation was overheard between one of the two defendants and an employee of the restaurant. Only a few words were heard, but one of them appeared to be an exclamation shouted by one of the restaurant employees of the word, `robbery.' Immediately thereafter, the car sped away from the location.
"The car again drove for some distance and appeared to get back on an interstate and drove to a location in the eastern section of Jefferson County known as Trussville. The car drove to a secluded location wherein the victim, Kathy Bedsole, and her companion, Charles Leonard, were taken from the trunk of the car. The second defendant, later identified as Richard David Kinder, tied the victim and her companion together with a length of rope, and after being tied together, the defendant Kinder retrieved the purse belonging to the victim and removed from said purse two twenty dollar bills which had previously been given to the victim by her father prior to her leaving her home.
"After a brief conversation between the defendant, David Duren, and Richard David Kinder, the defendant Kinder turned the victim and her companion in a position where the victim, Kathy Bedsole, was facing away from the defendant David Duren. At this time the defendant Duren raised the pistol which he had had in his possession and fired one shot, which appeared to strike the victim Bedsole. On firing the shot, the victim *114 Bedsole fell with her companion, Charles Leonard, landing on top of her, as they were still tied together. At this time defendant David Duren aimed the pistol at Charles Leonard and fired approximately four times with three of the shots hitting the witness Charles Leonard in the chest and the legs. After defendant David Duren quit shooting, he and codefendant Richard Kinder left in the victim Charles Leonard's car.
"Shortly thereafter, the witness Charles Leonard was able to free himself from the rope binding him with the victim Kathy Bedsole, and he walked to a location where he was able to gain assistance and call the sheriff's office for further assistance. When interviewed by the sheriff's deputy answering the call and after ascertaining from witness Leonard as to what had transpired, a radio transmission was then sent and subsequently received by another deputy sheriff who later observed defendants Duren and Kinder walking along a public roadway in the Roebuck/Huffman area. On questioning the individuals and observing their appearance, they were later taken into custody, and on subsequent questioning by Detective Sgt. M.E. White, made a statement admitting their participation in this crime.
"Further testimony by Dr. Robert Brissie established the cause of death of the victim, Kathy Bedsole, as being the result of a small caliber distant gunshot wound to the back of the head with penetration of the brain."
The undisputed facts show that the capital offense was committed during the commission of a robbery and a kidnapping. The trial judge's charge on aggravating circumstances was incorrect to the extent that it charged the jury that the only aggravating circumstances they could consider were that the capital offense was committed while the defendant was engaged in the commission of a robbery or kidnapping. However, the defendant was in no way prejudiced by the fact that the trial judge charged the aggravating circumstances in the alternative rather than the conjunctive.
The aggravating circumstance that the capital offense was committed during a robbery, § 13A-5-49(4), corresponds to the aggravation alleged in the indictment of murder during a robbery, § 13A-5-40(a)(2). Beck v. State, 396 So.2d 645, 663 (Ala. 1980). In this case, the trial judge could have directed the jury to find the presence of that aggravating circumstance.
"The aggravating circumstance relied upon by the prosecution may be the one corresponding to the aggravating component in the indictment. If so, the instruction may be directory in form. Thus, depending upon the facts of the case, a jury may be told either to search the evidence for one or more aggravating circumstances, or they may be told that their verdict of guilty established the presence of an aggravating circumstance. See Ex parte Kyzer, 399 So.2d 330, 335 (Ala.1981); Ala. Code § 13A-5-50 (Supp.1981)." J. Colquitt, The Death Penalty Laws of Alabama, 33 Ala.L. Rev. 213, 323, n. 743 (1982).
See also E. Carnes, Alabama's 1981 Capital Punishment Statute, 42 Ala.Law. 456, 482-83 (1981).
The undisputed facts of this case show that the defendant abducted the two victims and killed one of them. His actions show that beyond any doubt he is at the very least guilty of kidnapping in the second degree. Alabama Code 1975, § 13A-6-44. Since the trial court instructed the jury that they could consider either one aggravating circumstance or the other, since the jury's verdict that the defendant was guilty of the capital offense meant that the State had already established the presence of one of those aggravating circumstances, and since the undisputed evidence proved the existence of both aggravating circumstances, the judge's failure to instruct the jury on the legal elements of kidnapping was only harmless error.
In our finding of harmless error is implicit the principle that the trial court should have properly instructed the jury on the elements of kidnapping. "After hearing the evidence and the arguments of both parties at the sentence hearing, the jury *115 shall be instructed on its function and on the relevant law by the trial judge." Alabama Code 1975, § 13A-5-46(d). In instructing a jury that it may consider the aggravating circumstance or circumstances defined in § 13A-5-49(4), the trial court should also give the jury the statutory definition of the underlying felony or felonies involved (rape, robbery, burglary, or kidnapping). The jury instructions given at the end of the sentence hearing should include, among other things, "[e]xplanations of the aggravating circumstances relied upon by the prosecution." Colquitt, 33 Ala.L.Rev. at 322-23.
On December 6, 1982, the Supreme Court of Alabama issued an order "recommending" the use of the pattern jury instructions for the trial and sentencing aspect of cases tried under Alabama's 1981 death penalty act (§ 13A-5-40 et seq.) which were prepared by the Alabama Bar Institute for Continuing Legal Education. In a footnote to the aggravating circumstance defined by § 13A-5-49(4) and here under consideration, the proposed instructions state: "In the fourth aggravating circumstance, only the felony relevant to the facts should be read to the jury. If the jury was not instructed on the elements of that felony during the guilt stage, it should be done at this time." Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178, 84, n. 4 (1982).

II
Under the circumstances of this case, no error occurred when one judge presided over the defendant's trial and jury-sentencing hearing and another judge sentenced the defendant to death.
Alabama's 1981 Death Penalty Act provides for separate sentence hearings before the jury and the judge. Alabama Code 1975, §§ 13A-5-46 and -47. Circuit Judge Joseph J. Jasper presided over the defendant's trial and sentence hearing before the jury. After the jury had found the defendant guilty and recommended a sentence of death but before the sentence hearing before the judge had been held, Judge Jasper inadvertently discovered that he was distantly related by marriage to the defendant. Judge Jasper also disclosed to all the parties that the defendant's grandfather had attempted to contact him about the defendant after the jury's verdict and recommendation of death. The judge recused himself upon the request of defense counsel and assigned the case to Circuit Judge James S. Garrett. Judge Garrett held the sentencing hearing without a jury and sentenced the defendant to death.
A more detailed statement of the events is found in Judge Garrett's written order in sentencing the defendant to death in compliance with Alabama Code 1975, § 13A-5-47(d):
"The trial judge in this case, Judge Joseph Jasper, while attending a Circuit Judges Seminar at the Alabama Judicial College in Tuscaloosa during a period of April 24th, 25th and 26th of 1984 learned through a telephone conversation with his deceased wife's mother that the defendant in this case, David Ray Duren, was distantly related to his deceased wife and that she was a fifth cousin to the defendant in this case, and further that the Judge's children would be sixth cousins to the defendant.
"This was the first occasion that any degree of relationship was made known to the trial judge in this case, and on being made aware of said relationship, on April 30th, the Court called this matter to the attention of the attorneys for the State, the attorneys for the defendant, and is made a part of the court record or the transcript in this case. The trial judge, Judge Jasper, further communicated with the Judicial Inquiry Commission, asking for an advisory opinion as to his ability to preside further over the matters in this case. The Judicial Inquiry Commission in its response to Judge Jasper's letter restated Canon 3C of the Alabama Canons of Judicial Ethics, advising him that disqualification is not required for relationships more distant than the fourth degree. The Judicial Inquiry Commission through the Hon. Kenneth F. Ingram, Chairman, advised *116 Judge Jasper that in the Commission's opinion that he was not disqualified from sitting in the sentencing portion of the proceedings.
"Subsequent to that hearing on to-wit June 15th, 1984, a further hearing was held on a motion to recuse, filed by attorney for the defendant, Hon. Roger Appell, which said hearing is a part of the trial transcript in this case. After due consideration of the motion for recusal, Hon. Judge Jasper did recuse himself from further matters in this case and has referred the case to this Court to conduct the sentencing hearing and all matters concerning this case from that point forward."
Before assigning the defendant's case to Judge Garrett, Judge Jasper sought and received assurances from both defense counsel and the defendant that there were no objections to that assignment. After Judge Jasper had recused himself and appointed Judge Garrett, the defendant filed a "motion for a new trial or in the alternative for a new jury sentencing hearing." The defendant argues that Judge Garrett should not have been allowed to impose sentence since he did not have the opportunity to observe the character and demeanor of the witnesses who testified at trial and at the jury-sentencing hearing.
Before the sentencing hearing, Judge Garrett reviewed the transcript of the testimony and proceedings at trial and at the jury-sentencing hearing. He informed both sides that they would have the opportunity to present witnesses at the sentencing hearing. On one occasion, Judge Garrett stated, "I would expect witnesses would be called by either or both sides which the Court would see because all of that was done before at the trial, and certainly nothing would preclude that from being done at a sentencing hearing before the Court."
At the jury-sentencing hearing, the State relied on the testimony presented at trial and did not present any evidence. The defense called the following witnesses: (1) Shelley Davis, (2) Mary Joe Detlefsen, (3) James Duren, (4) Raymond H. Duren, (5) Shelby Duren, (6) Terri Sullivan, and (7) the defendant. At the sentence hearing held before Judge Garrett, five of those same witnesses, including the defendant, testified. The testimony of Shelley Davis and Terri Sullivan, who did not testify, was cumulative to that of those witnesses who did.
In Hill v. State, 455 So.2d 930, 935, affirmed, 455 So.2d 938 (Ala.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984), this Court held that, where the trial judge died, a different judge could sentence the defendant in a capital case after holding another sentencing hearing and after reviewing the records and transcripts of the prior proceeding. "This is in accord with the general rule that it is not error for a judge other than the one who tried the accused to pronounce judgment and sentence. Annot., 83 A.L.R.2d 1032 (1962)." Hill, supra. See also Berard v. State, 402 So.2d 1044, 1051 (Ala.Cr.App.1980).
Under both the 1981 Death Penalty Act, under which the defendant was convicted and sentenced, and the 1975 death penalty statute involved in Hill and Berard, the jury's "sentence" of death was advisory only. See Baldwin v. Alabama, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). The distinctions between those two acts would not warrant the invalidation of the substitution of judges which occurred in this case nor would those distinctions justify a result different from that reached in Hill and Berard.
The defendant grounds his objection on the fact that Judge Garrett did not hear the defendant's trial testimony, did not observe and feel the emotion of the testimony and was therefore not able to determine the defendant's "extreme remorse over his acts." Appellant's brief, p. 11. "[T]he principal pragmatic objection to the substitution of judges seems to be that where a new judge assumes the bench after testimony has been adduced, although there is available to him the stenographer's report of prior evidence, he is denied the opportunity to observe in person the deportment and demeanor of testifying witnesses on the stand, which factors are of considerable importance in weighing the evidence, and *117 by reason of being elusive in nature cannot be incorporated into the record, so it is argued, in such a manner that they may be given their due and proper consideration in rendering unto the accused a fair and impartial trial." 83 A.L.R.2d at 1033.
This argument is not persuasive in this case because here Judge Garrett did hear and observe the defendant and his witnesses testify. The defendant was given every opportunity to present the witnesses he desired. "While ... [the defendant's] alleged remorse and apparent cooperation possibly could have been considered as non-statutory mitigating circumstances, pursuant to Code 1975, § 13A-5-52, whether to consider them as such was within the discretion of the trial judge. Cochran v. State, 500 So.2d 1161 (Ala.Cr.App.1984), cert. granted (Ala., July 24, 1984)." Ex parte Harrell, 470 So.2d 1309, 1318 (Ala.), cert. denied, ___ U.S. ___, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
Finally, we note, again, that the evidence in this case was not disputed and was, in fact, for the most part, admitted by the defendant. See Issue I. For these reasons and under the circumstances of this case, we find no error in the substitution of judges.

III
The defendant argues that the denial of his request for the State to provide him reasonable funds to employ experts denied him due process of law.
The defendant is indigent and was represented at trial by appointed counsel. Prior to trial, by written motion, he requested the aid of (1) a criminal investigator "to investigate the facts and witnesses surrounding the alleged crime"; (2) a "polling expert ... to conduct a scientific survey of public opinion in Jefferson County regarding the public's knowledge of the case and their belief or disbelief in the Defendant's guilt" and to aid in the presentation of a motion for change of venue and a motion for individual questioning of jurors; (3) a "jury selection expert", a "juristic psychologist" to aid in the voir dire and selection of the jury; (4) an "expert on death qualified juries"; (5) a psychologist and a psychiatrist "to ascertain the existence of any mitigating circumstances relating to defendant's mental state or capacity"; and (6) a "presentence investigation expert" to conduct a presentence investigation. The defendant's estimated cost of these services totaled $6,750.
The determination of this issue is governed by Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53 (1985), which held "that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." In Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2637, n. 1, 86 L.Ed.2d 231 (1985), the United States Supreme Court found "no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought [a criminal investigator, a fingerprint expert, and a ballistics expert]" given that "petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial."
In Ex parte Grayson, 479 So.2d 76, 79 (Ala.), cert. denied, ___ U.S. ___, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). Our Supreme Court held that a denial of funds to pay defense experts does not amount to a deprivation of constitutional rights. In an opinion issued eleven days before Ake was decided, the Alabama Supreme Court held:
"The legislature decided in Code of 1975, § 15-2-21(d), that, up to a maximum limit of $500, the State will reimburse the reasonable expenses incurred in defending an indigent defendant on approval in advance by the trial court. Petitioner alleges that this amount did not allow him to procure the expert witnesses that were needed for his defense and, therefore, deprived him of his constitutional right to effective counsel. In Thigpen v. State, 372 So.2d 385 (Ala.Crim.App.), cert. denied, 372 So.2d 387 (Ala. 1979), *118 cert. denied, 444 U.S. 1026, 100 S.Ct. 690, 62 L.Ed.2d 660 (1980), the Court of Criminal Appeals held that `a denial of funds to pay defense experts ... does not amount to a deprivation of constitutional rights.' The provision for funds for expert witnesses is within the discretion of the legislature, not the courts. However, the Court of Criminal Appeals recognized in the present case that `constitutional guarantees may require a state to provide an indigent criminal with expert assistance.'
"The only time a defendant, whether indigent or not, has the right to have an independent expert examine physical evidence is when such evidence is (1) `critical' and (2) subject to varying expert opinions. Barnard v. Henderson, 514 F.2d 744 (5th Cir.1975). To be `critical,' the evidence must be the only evidence linking the accused with the crime or proving an element of the corpus delicti. Hoback v. Alabama, 607 F.2d 680 (5th Cir.1979). Even if the evidence is indeed `critical,' it is not subject to independent examination unless it is also subject to varying expert opinion. White v. Maggio, 556 F.2d 1352, 1358 (5th Cir.1977). This is the law of this state. Gwin v. State, 425 So.2d 500, 508 (Ala.Crim.App. 1982), cert. quashed, 425 So.2d 510 (Ala. 1983)....
"In this case, we agree with the Court of Criminal Appeals that the State was not constitutionally required to provide this indigent with the services of expert witnesses. See Hoback, supra. The trial judge did grant Grayson's request for funds up to the $500 limit. The defense chose to expend them on a public opinion survey of the county for purposes of challenging venue. That decision was one for defense counsel to make. But it is not constitutionally required that the State give reimbursement for every expense which defense counsel believes is needed. The legislature has decided that $500 is a reasonable amount. We do not find that this limit contravenes the defendant's Sixth Amendment rights."
On application for rehearing our Supreme Court addressed Ake:
"Petitioner calls our attention to a recent decision of the United States Supreme Court, Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), which, petitioner argues, required the State of Alabama to provide him with a pathologist of his own choosing to assist him during his preparation for trial and during the trial itself....
"Petitioner interprets Ake as requiring that he have access, provided by the State, to a forensic pathologist who would furnish assistance to petitioner as to the cause of death of the victim, Annie Laurie Orr.
"The issue in Ake, supra, was whether or not an apparently insane indigent had the right of access to a psychiatrist to determine his sanity at the time of the alleged offense. In response to that issue, the Supreme Court stated:
"`We hold that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one.'
"Petitioner does not claim that he was deprived of access to a psychiatrist's assistance. He claims, instead, a right to the services of a pathologist. With deference to petitioner's novel contention, there is nothing contained in the Ake decision to suggest that the United States Supreme Court was addressing anything other than psychiatrists and the insanity defense. Certainly, that decision cannot be broadly interpreted to require a State to provide experts of any category of a defendant's own choosing to assist him in preparing whatever defense he chooses. We have been cited to no other authority requiring such appointments." Ex parte Grayson, 479 So.2d at 82.
We find that the trial court did not commit error in denying the defendant's motion for funds to employ experts even if the principles of Ake apply to anything other than psychiatrists and the insanity defense.
*119 The criminal investigator was properly denied because Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires the prosecutor to disclose evidence favorable to the accused on the issues of guilty or punishment, but "the Court has not gone the full road and expressly required that the State provide to the defendant access to the prosecutor's complete files, or investigators who will assure that the defendant has an opportunity to discover every existing piece of helpful evidence." United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 3390, 87 L.Ed.2d 481 (1985). Here, the only witnesses to the crime were the defendant himself, the surviving victim Leonard, and co-defendant Kinder. The State's evidence was virtually undisputed and, on the only contested issue, the defendant was the only one who could testify that he did not intend to shoot Miss Bedsole. Under these circumstances, the trial court's refusal to provide the defendant with a criminal investigator at state expense was proper.
The denial of funds to employ a "polling expert," "a jury selection expert," and an "expert on death qualified juries" was also proper. In Ex parte Grayson (opinion on original submission), our Supreme Court held:
"Did the statutory limit on state-provided funds for expenses prevent defendant from proving actual prejudice in the community at large, and thus cause him to lose his request for change of venue?
"`The proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination,' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim. App.1978), not through extensive and expensive surveys. It costs nothing to question the prospective jurors; thus the limit on available funds cannot be said to have prevented defendant from showing actual prejudice of the jurors." 479 So.2d at 80.
In his motion for change of venue, the defendant alleged that "[T]he pretrial publicity has created an inherently prejudicial atmosphere making the selection of a fair and impartial jury impossible." Prior to trial, defense counsel told the trial judge, "Judge, we have a motion for change of venue, but we have not been able to present sufficient evidence to this court because we don't have the funds to present any testimony on that."
As best this Court can determine from the record, the jury venire consisted of fifty-four persons. Twenty-nine of those individuals indicated on voir dire that they had read or heard something about the crime. Each of those twenty-nine people was separately interviewed to determine the nature and effect of the pretrial publicity to which each had been exposed. Of these twenty-nine persons, the defense counsel challenged only one for cause on the basis of pretrial publicity. That particular venireman indicated that he had formed an opinion that the defendant was guilty. That venireman was excused for cause. The remaining twenty-eight venire members stated that they could give the defendant a fair trial based upon the evidence presented at trial.
The record contains no newspaper articles about the crime. There was no testimony or evidence presented about the nature of the pretrial publicity. Under these circumstances, the defendant has "offered little more than undeveloped assertions that the requested assistance would be beneficial" and his request was properly denied. Caldwell, 472 U.S. at 323, n. 1, 105 S.Ct. at 2637, n. 1, 86 L.Ed.2d 231.
"[A] State's refusal to provide the defendant psychiatric assistance in presenting mitigating evidence at his sentencing proceeding, where the State presents psychiatric evidence against the defendant, also violates due process." Bowden v. Kemp, 767 F.2d 761, 763 (11th Cir.1985), citing Ake, 470 U.S. at 84, 105 S.Ct. at 1097, 84 L.Ed.2d 53. Here, as in Bowden, there was "no claim here that he was denied the assistance of a psychiatrist in determining whether to present an insanity defense." Bowden, 767 F.2d at 763. The defendant did not demonstrate to the trial judge that his sanity at the time of the offense was to be a significant factor at *120 trial. Consequently, Ake's "first holding" that speaks to such a claim is inapplicable. Bowden, 767 F.2d at 764. Although the defendant initially entered a plea of not guilty by reason of mental disease or defect, that plea was withdrawn before trial. Prior to trial, the trial court offered "to order the State psychiatrist to examine this defendant." Defense counsel rejected that offer and stated, "No, sir, we don't wish that at this time."
Defense counsel testified as a witness on his motion requesting funds to hire experts. He stated that the defendant had been examined and "initially evaluated" by a Dr. Steve Bair while confined in the county jail. At the time counsel was testifying, Dr. Bair had not filed his report as he had just examined the defendant the previous day. The defendant's family had been able to raise the $288 for the initial evaluation but no more. The results of Dr. Bair's evaluation are not revealed nor is there any further mention of Dr. Bair contained in the record.
In the sentencing proceedings, both before the jury and the judge, the prosecution presented no new evidence but merely relied upon what had already been presented at trial. At trial, the State presented no expert psychiatric evidence. Here, as in Bowden, "[u]nlike the sentencing situation in Ake, ... [the] prosecutor had no need to present psychiatric evidence to show an aggravating factor and he presented none. The dangers and inequities which concerned the Court in Ake consequently did not exist." Bowden, 767 F.2d at 764, n. 5. Again, the defendant failed to exhibit to the trial judge that his mental condition at the time of the offense was to be a significant factor at his sentencing proceedings.
The defendant also requested funds to employ a "presentence investigation expert." With regard to this request, the defendant offered only the "undeveloped assertions that the requested assistance would be beneficial." Caldwell, 472 U.S. at 323, n. 1, 105 S.Ct. at 2637, n. 1, 86 L.Ed.2d 231. Consequently, he has demonstrated no due process violation in the trial judge's denial of that request.
For all of the reasons stated above, we find no error in the trial judge's denial of the defendant's motion to hire experts.

IV
Although not raised as an issue on appeal, the indictment mistakenly charged the defendant with an offense "in violation of Act No. 81-878 of the 1981 Session of the Alabama Legislature" (emphasis added), instead of Act No. 81-178. See Alabama Code 1975, § 13A-5-39 et seq. "Miscitation of a code section does not void an indictment which otherwise states an offense; and, in the absence of a showing of actual prejudice to the defendant, reference to the erroneous code section will be treated as mere surplusage." Ex parte Bush, 431 So.2d 563, 564 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).

V
In reviewing the propriety of the defendant's death sentence, our consideration of the questions required by § 13A-5-53 is severely hampered by the failure of the trial court to "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in section 13A-5-49, each mitigating circumstance enumerated in section 13A-5-51, and any additional mitigating circumstances offered pursuant to section 13A-5-52." § 13A-5-47(d). "Without knowing what the trial judge did, we are unable to properly review his sentencing decision." Ex parte Cochran, 500 So.2d 1179 (Ala.1985).
This cause is remanded to Jefferson County Circuit Judge James S. Garrett with directions that he enter specific written findings concerning the existence or nonexistence of the aggravating and mitigating circumstances based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the presentence investigation report and any evidence submitted in connection with it as directed and required by § 13A-5-47(d).
*121 Those findings shall be sent to this Court for review.
The judgment of the circuit court is remanded with directions.
REMANDED WITH DIRECTIONS.
All Judges concur.

ON RETURN TO REMAND
BOWEN, Presiding Judge.
On remand, the trial judge fully complied with the directions of this Court and entered specific written findings concerning the existence or nonexistence of the aggravating and mitigating circumstances.
Our review convinces us that the defendant was fairly and properly convicted of the capital offense charged and sentenced to death. The judgment and sentence of the circuit court are affirmed.
OPINION EXTENDED;
AFFIRMED.
All Judges concur.